IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SECURITYNATIONAL MORTGAGE COMPANY,<br><br>           Plaintiff,<br><br>v.<br><br>AURORA  BANK  FSB  (formerly  known  as Lehman  Brothers  Bank,  FSB)  and  AURORA LOAN SERVICES LLC,<br><br>           Defendants. | **SUMMARY OF FACTS, CONCLUSIONS OF LAW and** <u>**AMENDED**</u>* **ORDER GRANTING SECURITYNATIONAL's MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:11-cv-00434 DN<br><br>Judge David Nuffer |

Plaintiff SecurityNational Mortgage Company ("SecurityNational") alleges that Defendants took funds to which they are not entitled under an Indemnification Agreement. That agreement, entered into in settlement of a claim by Defendants against SecurityNational, required SecurityNational to fund losses Lehman Brothers' Bank FSB ("Lehman Bank") incurred on mortgages which SecurityNational sold to Lehman Bank. Lehman Bank is the prior name of the entity now called Aurora Bank FSB ("Aurora"). Security National sues because the losses on the mortgages were actually suffered by Lehman Brothers Holdings Inc. ("LBHI") with which SecurityNational has no contractual relationship. Aurora Loan Services, LLC ("Aurora Loan Services") was the servicer on the loans.

---

* This order is amended after reconsideration and submissions following the summary judgment hearing. *See* Order Granting in Part and Denying in Party Defendants Motion to Reconsider Summary Judgment Ruling, <u>docket no. 114</u>, filed December 23, 2014. The prior Summary of Facts, Conclusions of Law and Order Granting SecurityNational's Motion for Summary Judgment, <u>docket no. 94</u>, filed May 6, 2014, contained paragraphs 21-24 on page 25 which no longer appear in this order as a result of reconsideration. Paragraph 16A of the Conclusions of Law was added as a result of reconsideration. Paragraph 38 of the Conclusions of Law was modified and paragraphs 39- 44 of the Conclusions of Law are new, based on filings after the summary judgment hearing which are referenced in those paragraphs.

SecurityNational and Defendants moved for summary judgment.[1] This order grants SecurityNational's motion and denies Defendants' motion.

UNDISPUTED FACTS ............................................................................................. 3

    General Background – Loan Purchase Agreement and Indemnification Agreement ................ 4

    Sale of Loans by Lehman Bank to LBHI ............................................................. 4

    Aurora Services and Servicer ......................................................................... 9

    Payments Under Indemnity Agreement ............................................................. 15

    Assignment of Rights in the Indemnification Agreement to LBHI ............................. 15

    The Dispute Arises .................................................................................... 17

CONCLUSIONS OF LAW ....................................................................................... 18

    Indemnification Agreement ......................................................................... 19

    Indemnification for Losses – Scope ................................................................. 20

    New York Law – Contract Interpretation – Indemnification ................................... 21

    Arguments That LBHI Is an Indemnitee Fail ..................................................... 23

    LBHI's Purchase of Loans Without Recourse Against Lehman Bank ........................ 25

    No Losses by Lehman Bank, Aurora Loan Services or the Servicer ......................... 25

    Assignment of the Indemnification Agreement Gives LBHI No Right to Indemnity ......... 26

    Breach of Contract .................................................................................... 27

ORDER ............................................................................................................. 30

---

[1] SecurityNational Mortgage Company's Motion for Summary Judgment, docket no. 45, filed under seal September 4, 2012; Defendants' Motion for Summary Judgment, docket no. 53, filed October 11, 2012.

The parties presented allegedly undisputed facts on their motions, which were refined by the court and submitted to counsel for review[2] before a hearing held February 27, 2013 ("Hearing").[3] Thereafter, the parties submitted an agreed summary of undisputed facts[4] (with one dispute resolved by this order), and proposed conclusions of law.[5] The legal issues presented are resolved in this order.

## UNDISPUTED FACTS

1.      SecurityNational is a Utah corporation with its principal place of business in Utah.[6]

2.      Lehman Bank is a federal savings bank, and at relevant times, was a wholly owned subsidiary of Lehman Brothers Bancorp, Inc., a Delaware corporation ("Lehman Bancorp").[7] Lehman Bancorp was a wholly owned subsidiary of LBHI.[8] Neither Lehman Bank, nor its parent Lehman Bancorp, was or is a party to the bankruptcy of LBHI.

3.      Aurora Loan Services at relevant times was a wholly owned subsidiary of Lehman Bank .[9] It was not, and is not, a party to LBHI's bankruptcy

4.      LBHI is a Delaware corporation, with its principal place of business in New York. A voluntary bankruptcy under Chapter 11 of Title 11 of the United States Code was commenced

---

2 Docket no. 79, filed February 22, 2013.

3 Minute Entry, docket no. 80, filed February 27, 2013.

4 Docket no. 84, filed March 29, 2013.

5 Proposed Conclusions of Law and Order Granting Plaintiff's Motion for Summary Judgment, docket no. 85, filed March 29, 2013; Defendants' Proposed Conclusions of Law, docket no. 86, filed March 29, 2013.

6 Complaint ¶ 1, docket no. 2, filed May 11, 2011.

7 Complaint ¶ 2; Lehman Brothers Company Overview (Overview) at 1, 5, docket no. 47-17, filed under seal, September 4, 2012. Lehman Brothers Bank, FSB changed its name, which at present is Aurora Bank FSB. It is the same company, but a different name.

8 Brady Dep. at 106-107, docket no. 48-7, filed under seal, September 4, 2012; Overview at 1, docket no. 47-17.

9 Complaint, ¶ 3; Overview at 1, 5, docket no. 47-17.

by LBHI on September 15, 2008. It is alleged that it is authorized to operate its business and manage its property as a debtor in possession under the United States Bankruptcy Code. [10]

### General Background – Loan Purchase Agreement and Indemnification Agreement

5.      On or about April 15, 2005, Lehman Bank and SecurityNational entered into a Loan Purchase Agreement ("LPA") wherein Lehman Bank would purchase residential mortgage loans from SecurityNational. The LPA incorporated by reference a document known as the Seller's Guide which was issued by Aurora Loan Services. [11]

6.      Many loans were purchased by Lehman Bank from SecurityNational pursuant to the LPA. [12]

7.      In view of alleged issues raised by Lehman Bank/Aurora Loan Services with respect to certain loans sold by SecurityNational to Lehman Bank, Lehman Bank, Aurora Loan Services and SecurityNational entered into an Indemnification Agreement dated December 17, 2007, over two years after the LPA. [13]

8.      After the Indemnification Agreement was executed, it became an operative document between Lehman Bank and Aurora Loan Services, and SecurityNational with respect to certain matters such as payments as long as the Indemnification Agreement was in effect.

### Sale of Loans by Lehman Bank to LBHI

9.      The Indemnification Agreement provided for potential "indemnification" payments by SecurityNational if there were "Losses" to (i) Lehman Bank "and/or" (ii) Aurora Loan Services or the (iii) Servicer from loans sold to Lehman Bank by SecurityNational. In the

---

[10]Overview at 1, 2, docket no. 47-17; *Lehman Brothers Holdings Inc., v. Security National Mortgage Co.*, Case No. 2:11-cv-00519 TS, Amended Complaint ¶ 2, docket no. 23, filed January 5, 2012.

[11] Complaint, ¶ 9; LPA, docket no. 47-1, 47-2, 47-3, filed under seal, September 4, 2012.

[12] Complaint, ¶ 10.

[13] Complaint, ¶ 12; Indemnification Agreement, docket no. 47-4, filed under seal, September 4, 2012.

Indemnification Agreement, Lehman Bank is referred to as LBB and Aurora Loan Services is referred to as Aurora. "Losses" is a term specifically defined in said agreement:

> Section 1. <u>Indemnification</u>. The Seller hereby and at all times hereafter agrees to indemnify and hold LBB and/or Aurora and the Servicer harmless from and against seventy-five percent (75%) of all losses, damages, penalties, fines, forfeitures, legal or other fees, judgments, costs, expenses, debts, obligations and claims which LBB and/or Aurora or the Servicer may have or may hereafter suffer, incur be put to, pay or lay out, or sustain as a result of any cause related to any current or future default by the mortgagor on the Mortgage Loans with alleged breaches as detailed on the attached Schedule A on an individual basis (collectively, "Losses"). Further, LBB and Aurora agree to release the Seller from any obligation to pay the remaining twenty-five percent (25%) of all losses, damages, penalties, fines, forfeitures, legal or other fees, judgments, costs, expenses, debts, obligations and claims which LBB and/or Aurora or the Servicer may have or may hereafter suffer, incur, be put to, pay or lay out, or sustain as a result of any cause related to any current or future default by the mortgagor on the Mortgage Loans as detailed on the attached Schedule A on an individual basis. The Losses shall be paid and discharged by Seller through the Deposit specified in Section 5 below. The Losses shall be invoiced or apportioned against the Seller as they are incurred by LBB and/or Aurora or the Servicer, absolutely, and the existence and amount of any such Losses shall be determined by LBB and/or Aurora and the Servicer in their sole and absolute discretion.[14]

The first text in the Indemnification Agreement reads:

> This Indemnification Agreement ("Agreement") dated as of December 17, 2007, is made by and between Lehman  Brothers Bank, FSB a federal savings bank (together with its successors, assigns, operating divisions, affiliates and subsidiaries, "LBB"), and Aurora Loan Services LLC, a Delaware limited liability company, and wholly-owned subsidiary of LBB (together with its successors, assigns, operating divisions, affiliates and subsidiaries, "Aurora", or collectively with LBB as "LBB") having an office for the conduct of business at 10350 Park Meadows Drive, Littleton, Colorado 80134, and Security National Mortgage Company (together with its successors, assigns, operating divisions, affiliates and subsidiaries, "Seller"), having an office for the conduct of business at 5300 South 360 West, Suite 150, Murray, Utah 84123. LBB, Aurora, and the Seller are sometimes referred to herein as parties.[15]

---

[14] *Id.* at 2.

[15] *Id.* at 1.

10.     The loans for which payments from SecurityNational pursuant to the

Indemnification Agreement were applied are listed in this table, which also includes the date

when each of the loans was sold to LBHI, and when SecurityNational money was applied to each

of the loans ("Loans"):[16]

| Loan Nos. | Date of Sale by LBB to LBHI | Date of Application of SNMC Funds | Amount Paid by SNMC |
|---|---|---|---|
| 3211 | 2/28/2006 | 4/2008 | $  85,237.25 |
| 6352 | 6/30/2004 | 5/2008 | $  24,664.06 |
| 0361 | 3/31/2006 | 8/2008 | $114,997.91 |
| 6845 | 5/31/2006 | 7/2009 | $  65,894.68 |
| 4172 | 5/31/2007 | 6/2008 | $  71,775.93 |
| 2787 | 12/28/2006 | 4/2008 | $  66,603.22 |
| 5174 | 12/28/2006 | 6/2008 | $  53,023.34 |
| 4032 | 11/14/2007 | 7/2009 | $  83,311.88 |
| 3179 | 1/31/2006 | 7/2008 | $126,401.93 |
| 7903 | 9/29/2006 | 8/2009 | $  38,998.07 |
| 9660 | 9/29/2006 | 6/2008 | $202,677.14[17] |
| 2545 | 11/14/2007 | 5/2010 | $  27,554.57 |
| 6022 | 6/29/2007 | 7/2010 | $204,419.24 |
| 1230 | 8/30/2006 | 6/2008 | $  85,606.43 |
| 0005 | 4/30/2007 | 9/2009 | $100,226.43 |
| 6301 | 1/31/2008 | 9/2010 | $290,444.07 |
| 2765 | 4/1/2008 | 8/2008 | $  27,978.45 |
| 0787 | 6/30/2008 | 7/2009 | $  74,632.03 |
| 6829 | 5/31/2006 | 7/2009 | $129,041.69 |
| 8171 | 1/31/2008 | 11/2010 | $249,099.47 |
| 2159 | 4/1/2008 | 12/2008 | $  34,436.73 |
| 3233 | 6/20/2006 | 10/2009 | $  98,313.96 |
| 0490 | 8/28/2006 | 11/2009 | $  94,718.04 |
| 7393 | 4/1/2008 | 10/2008 | $  99,858.90 |
| 1260 | 4/1/2008 | 10/2008 | $  63,050.58 |
| 6334 | 4/1/2008 | 11/2008 | $  88,427.19 |
| 9764 | 4/1/2008 | 11/2008 | $117,959.49 |
| 7520 | 4/1/2008 | 7/2009 | $122,452.26 |
| 6842 | 4/1/2008 | 12/2008 | $  21,887.05 |

---

[16] Docket nos. 47-5 and 47-6, filed under seal, September 4, 2012.  Although assisting Lehman Bank, Aurora Loan Services actually never owned any of the Loans. (LBHI 30(b)(6) deposition of Jeffrey Heston Gray at 43, 68, 89-90, docket no. 48-3, filed under seal, September 4, 2012.)

[17] As to this loan, $266,758.23 was first applied by Lehman Bank/Aurora, then later revised to $202,677.14. See docket no. 47-6, at 4 when viewed electronically. (In most instances in this case

, exhibits to declarations were filed with a blank cover page, making the page number of the document different than the page number of the document as filed with a cover page. This order refers to pagination as filed electronically in CM/ECF.)

| 9975 | 9/29/2006 | 12/2009 | $238,048.64 |
| 8714 | 7/31/2007 | 7/2009 | $224,295.31 |
| 3931 | 1/31/2006 | 2/2010 | $248,064.54 |
| 3183 | 4/28/2006 | 5/2010 | $278,692.66 |

11.     When each of the Loans was sold by Lehman Bank to LBHI, Lehman Bank was fully compensated, *i.e.*, at the time of the sale Lehman Bank was paid the full amount that it had expended in each of the Loans.[18]

12.     At the time of the sales of the Loans by Lehman Bank to LBHI, SecurityNational was not aware of the sales, including not being aware of such at the time when the Indemnification Agreement was executed.[19]

13.     Not only was Lehman Bank fully compensated for the sale of the Loans to LBHI, but all of the Loans were purchased by LBHI "without recourse" so that LBHI had no remedies against Lehman Bank for any deficiencies in the Loans. For example, in a "Motion of the Debtors Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019(b) for Establishment of Procedures for the Debtors to Compromise and Settle Claims in Respect of the Origination or Purchase of Residential Mortgage Loans," dated July 15, 2009, as to residential loans purchased, LBHI stated at page 5 that "[t]he sales of the Residential Mortgage Loans from LBB to LBHI were non-recourse, such that LBHI did not have remedies against LBB for any deficiencies of the Residential Mortgage Loans."[20]

14.     Lehman Bank's selling the Loans to LBHI was part of a business plan or system that was established:

---

[18] Gray, LBHI 30b)(6) Dep. at 92-93, docket no. 48-3.

[19] Beckstead Dep. at 101-102, docket no. 48-8, filed under seal September 4, 2012; Johnson Dep. at 31, docket no. 48-9, filed under seal September 4, 2012.

[20] Docket no. 47-7, filed under seal September 4, 2012.

Q. Now, according to my understanding, at least, with respect to the indemnification like Exhibit 3 [Indemnification Agreement], I think it's fair to say we've established that the bank had no loss or losses as defined in Exhibit 3, did it?

A. And the question is did the bank suffer any losses as defined in section 1 of the Indemnification Agreement?

Q. And add to that with respect to the loans referenced in the Amended Complaint.

A. The bank did not incur a loss on these loans.[21]

\* \* \*

Q. Now, with respect to these loans which were listed on this exhibit to Exhibit 13 [Billing statement for $125,000 from counsel for LBHI together with summary of loan charges under the Indemnification Agreement], we have exhibits to exhibits here. Exhibit 13, these were all loans which – were these loans that LBHI purchased from Lehman Brothers Bank?

A. Yes, they are.

Q. And I guess you heard the testimony yesterday from Mr. Trumpp, with respect to these loans, the bank suffered no loss?

A. That's correct.

Q. And that's your understanding, too?

A. Yes it is.

Q. In fact, that's the way the system was set up, that the bank would not suffer a loss from any loan that it sold to Lehman Brothers Holdings, would it?

A. That's correct. There was no recourse when those loans were sold from the bank to LBHI.[22]

15.     The aforesaid "system" was established to protect the capital of Lehman Bank, and thereby enhance its loan purchasing capacity so as to be able to buy more loans for sale to, and for the benefit of, LBHI. The bank would not profit from the Loans under the system.

Q. (BY MR. PRICE)  Do you have any knowledge or understanding as to why Lehman Brothers Holdings would have bought the loans, let's say, the early default loans, as an example, as well as the others, for whatever price that Lehman Brothers Bank had in that loan?

A. It was standard procedure for loans to transfer to LBHI once they reached a certain state of default.

Q. Oh, so there was a standard procedure that if the loan was in default for a certain period, that they would be upstreamed to Lehman Brothers Holdings?

A. That's correct.

---

[21] Gray, LBHI 30(b)(6) Dep. at 92-93, docket no. 48-3.

[22] Gray, LBHI 30(b)(6) Dep. at 55-56, docket no. 48-3.

Q. And do you have any understanding as to why?
A. My understanding was that they preferred the loans to be with LBHI to – you know, for the disposition of the loan.
Q. Why?
A. I was not involved in making the policy, but it was my understanding that they preferred to incur those losses at the parent  [grandparent] level rather than at the bank level.
Q. Again, I'll ask my question. Do you have any understanding as to why they had to incur it at the grandparent level rather than at the bank level?
A. I only have speculation and business knowledge, but it would -- you would typically want to – distressed loans at a bank would encumber their capital, and you would want to free that up so that you would be able to make more loans.
Q. And isn't it true that's because these bank regulators come in, and if you have distressed loans, they make you write them off?
A. I haven't had direct dealings with regulators, so I can't say that they would necessarily make you write them off. They might make you also hold capital against it.
Q. But having distressed loans would affect the ability of the bank to make future loans, that is, the amount of money that it had available to make future loans, wouldn't it?
A. That's my understanding of how banks work, yes.
Q. And that's the same with Lehman Brothers Holdings bank, wasn't it?
A. I have no reason to think that's different.
Q. And during that period of time, 2006, 2007, it was the interest of Lehman Brothers Holdings to have the bank buy a lot of loans, wasn't it?
A. Yes, there was a – that was a business that Lehman Brothers was in, and they wanted to capitalize as much as possible.
Q. And with respect to this process of Lehman Brothers Bank buying loans and selling them to Lehman Brothers Holdings along this conduit chain that you heard testified about yesterday, the only company among the Lehman companies at that time that would actually have a chance to make a profit would be Lehman Brothers Holdings?
A. They are the company that would profit from the sale of the loan, if that was possible.[23]

**Aurora Services and Servicer**

16.    The "Servicer" is also referenced in section 1 of the Indemnification Agreement.

In Exhibit 13[24] to the deposition of Jeffrey Gray, which sets forth alleged damages on the part of

LBHI, there is a column entitled "Corporate Advances" which should include usual service

---

[23] Gray, LBHI 30(b)(6) Dep. at 63-66, docket no. 48-3.

[24] E-mail from Spohn to Price at 4 when viewed electronically, docket no. 47-8, filed under seal, September 4, 2012.

9

charges. No charges are shown in Exhibit 13 under "Corporate Advances," and with respect

thereto, LBHI's 30(b)(6) witness testified:

> Q. And what did you mean when you referenced corporate advances?
> A. Corporate advances are made by the servicer typically in the foreclosure process; foreclosure attorney, property preservation, collection inspections. And then through REO, those would be, again, property preservation, liquidation of the property.
> Q. Are those typical expenditures by a servicer?
> A. Yes, they are.
> Q. And that would reflect those typical expenditures by servicer if somehow they had not been recovered or in some other way?
> A. That's correct.
> Q. And you're showing here that there were no such corporate advances, right?
> A. There are no corporate advances that are payable by SecurityNational.
> Q. And what's the basis of your statement not payable by SecurityNational?
> A. The particular loan that we're looking at is a second lien, and the corporate advances would have been occurred [sic] on the first lien.
> Q. Well, I don't see that there's a corporate advance for any these loans, even the first liens. Am I missing something?
> A. No, you're correct.
> Q. So why were there no corporate advances on the other loans that are listed on Exhibit 13?
> A. The corporate advances that accrue become the liability of the new investor, which is the RLT trust. And they are not payable by SecurityNational.
> Q. So those – if there had been any advances, for instance, by the servicer, those were taken care of by the sale to the trust?
> A. That's correct. They wouldn't have been satisfied at that time. They aren't satisfied until liquidation of the property, but they would have transferred to RLT. They would have been their obligation.[25]

> \* \* \*

> Q. Is my understanding correct that based on this Exhibit 13, which you had a hand in preparing, that with respect to these loans under the Indemnification Agreement that you're showing no loss to the servicer?  Any servicer of these loans.
> A. This statement does not reflect a loss to the servicer.
> Q. And do you have any knowledge or information at all, with respect to the loans referred to in Exhibit 13, of a claim by any servicer of any loss with respect to those loans?
> A. Could you be more specific?

---

[25] Gray, LBHI 30(b)(6) Dep. at 50-51, docket no. 48-3.

Q. Yeah. With respect to those loans in Exhibit 13, do you have any knowledge or information, as you're sitting here today, as to whether any of the servicers for those loans have asserted or claimed a loss?

    MR. SPOHN:  I object as vague as to loss, asserting a claim.

A.  In each case, when the loan is liquidated, the servicer will send a billing to the investor to be reimbursed for those losses.

Q. (BY MR. PRICE)  You have no knowledge or information as to whether any of these servicers sent such a billing?

A. No, I don't.

Q. So as you're sitting here today, you don't have any knowledge or information that any servicer with respect to any of the loans in Exhibit 13 has made a claim against Lehman Brothers Holdings for any loss?

    MR. SPOHN:  Same objections.

A. I'm not aware of those – of those claims. We could certainly look for them.

Q. (BY MR. PRICE)  You're not aware of any?

A. That's correct.

Q. You certainly didn't reflect anything in this exhibit, did you, Exhibit 13?

A. No, it doesn't reflect any servicer losses.[26]

Exhibit A to Exhibit 20 to the deposition of Jeffrey Gray, a later, purported damage-related document, shows no servicer Losses either.[27]

    17.    The word "Aurora"  was also mentioned in section 1 of the Indemnification Agreement in addition to the bank and the servicer. Zachary Trumpp, who has worked for the benefit of LBHI since February 2009, testified that LBHI's claimed loss on the Loans in this action could be claimed under the Indemnification Agreement through Loss to Aurora Loan Services, even though LBHI was not a party to the agreement. This approach by LBHI is explained by Mr. Trumpp:

Q. (BY MR. PRICE)  I want you to look at Exhibit 13.

A. Okay.

Q. And I want you to show me there on that exhibit if there's any provision for a servicer loss.

    MR. SPOHN:  Object to the form.

A. And as I was trying to say earlier, Aurora Loan Services is LBHI's servicer on the loan. They are our agent, and we are paying

---

[26] Gray, LBHI 30(b)(6) Dep. at 58-60, docket no. 48-3.

[27] Docket no. 47-8, at 10-11, when viewed electronically, filed under seal, September 4, 2012.

them to service the loan on our behalf. So any loss that we have and, hence, this $3.7 million, [a claimed loss of LBHI] is also incurred and actually transacted as the servicer.

So to answer your question, you can't differentiate the two. The servicer had a loss; and, therefore, we [LBHI] had a loss.

Q. (BY MR. PRICE)  Okay. So I understand your testimony, what you're really telling me is that – the only thing that you're trying to claim is where Lehman Brothers Holdings has submitted a claim here [Exhibit 13] for 3.7 million in their own name, you're trying to say that somehow that's a claim for Aurora Loan Services?.
            MR. SPOHN:  Object to form.
Q. (BY MR. PRICE)  Is that your point?
            MR. SPOHN:  Object to the form.
A. I'm saying Lehman Brothers Holdings has a claim for $3.7 million. That loss was initially incurred by Aurora Loan Services as our agent. They incurred that loss as if they were us [LBHI].
Q. (BY MR. PRICE)  You mean they put out the money?
A. They were the servicer on the loan. They took the entire loan through the foreclosure process. They incurred the loss on the loan; and, ultimately, that loss was remitted to Lehman Brothers. [28]

18.    In a 30(b)(6) deposition of Lehman Bank, Jerald Dreyer testified of a loss to

Aurora Loan Services apart from the usual servicing costs:

Q. And then if you go to Exhibit 20 [Plaintiff's Initial Disclosures Pursuant to F.R.C.P. 26(a)(1)] and look at Exhibit A [chart relative to claimed damages attached to Exhibit 20], no costs and expenses are listed there.
            MR. SPOHN:  Objection, foundation.
Q. (BY MR. PRICE)  From your reconciliations that you've been showing what was applied for the bank, Lehman Brothers Holdings, and relative to the Indemnification Agreement showing no corporate advances, was there any particular loss to Aurora Loan Services?
            MR. SPOHN:  Object to the form.
A.   Aurora Loan Services would have had the loss initially. They would have had advanced proceeds to cover the loss.
Q. (BY MR. PRICE) Proceeds to whom?
A. To the investor [LBHI].
Q. And proceeds for what?
A. Basically, the loss on the loan. If, for example, there was 300,000 owed on the loan, and they got 200,000 in, then they basically had that $100,000 loss. That was on their books until they recovered that from the investor [LBHI].

---

[28] Trumpp Dep. at 111-113 docket no. 48-1, filed under seal September 4, 2012.

Q. So you're saying – how would – was this on the bank's books or
Aurora Loan Services' books?
A. It would have been on Aurora Loan Services' books.
Q. And you say they would show a loss with respect to that loan?
A. Correct.
Q. And then when was the loss covered supposedly?
A. It would have been whatever was the next reporting or
remittance cycle.
Q. It would be a bookkeeping entry?
A. No.
Q. No wire transfers of money?
A. Right.
Q. Just all bookkeeping?
A. Yeah. But – and they do have money that they remit to the
investor each month. So in this case, if it was LBHI, or whomever it
would be, they would – they would – in all likelihood, they would
net that loss from their remittance to the investor.[29]

19.     In a later 30(b)(6) deposition of Aurora Loan Services, Jerald Dreyer, again as the

30(b)(6) witness, testified of LBHI's loss being established through Aurora:

Q. Loss – what's the loss after liquidation?  Define that for me.
A. It's basically – once you have final, disposition of the loan –
so let's say that this went into foreclosure, went to foreclosure
sale, and then it was ultimately sold to a third party. So if there's
– you know, just to throw numbers out there. If it's a $200,000
loan and you have, you know, fees and expenses added on top
of that  and interest, perhaps, and say the total amount owed is
$250,000 and you're able to sell it for 150,000 – for 150,000 in
total proceeds, then the loss is 100,000 in that example. So that
would  be the loss that they would carry until they were
reimbursed.
Q. And with respect to that loss at that particular time, towards
the trust, there would be no money advanced by Aurora Loan
Services to the trust, would there?
        MR. SPOHN:  Object to the form.
A. At the time of liquidation?
Q. (BY MR. PRICE)  Yeah, after liquidation and the property is
sold and you   decide, "Okay, there's this $100,000," Aurora
Loan Services would not wire or send money to the trust, would
it, for that loss?
A. They potentially probably would. They would send the entire
250,000 on the example that I used, even though they only used
150,000. And then the following month is when they would seek
to get that $100,000 back.
Q. So it was a short term – more of a bookkeeping transaction
between the two, the servicer and the trust?
        MR. SPOHN:  Object to the form.

---

[29] Dreyer, Lehman Bank 30(b)(6) Dep. at 146-147, docket no. 48-2 , filed under seal September 4, 2012.

A.   It was – the way you were originally going to put it, the short term, I would say, is a better phrase that I would use.

Q. (BY MR. PRICE)  Because at the end of the day, both the trust and the servicer can't have the same loss, can they?

A. No.

Q. And the loss falls with the investor or the owner of the loan, doesn't it?

A. Ultimately, yes. [30]

20.     Mr. Dreyer testified:

Q. Mr. Dreyer, with respect to the question on loses, as I understood your testimony earlier today, Aurora Loan Services suffered no losses with respect to the loans that were sold from SecurityNational Mortgage to the bank and then to Lehman Brothers Holdings.

          MR. SPOHN:  Object to the form.

Q. (BY MR. PRICE)  I understand your testimony earlier today, including under Section 1.

A. At the end of the day, Aurora suffered losses. But at the end of the day, they were ultimately made whole for any losses they would have suffered.

* * *

Q. I say, as I understand your testimony, "at the end of the day," as you used the term, there was no actual loss by Aurora Loan Services?

          MR. SPOHN:  Object to form, vague as in time.

A.   Again, Aurora Loan Services, ultimately, if they had any losses, period, they would have been made whole by LBHI, or the trust, depending on what stage. [31]

21.     Aurora never owned any of the Loans.[32]  Zachary Trumpp explained the role of Aurora when he stated that "Aurora Bank [formerly Lehman Bank], post its acquisition, was typically the funder of the loans. Aurora Loan Services was the operational arm of the mortgage business."[33]

---

[30] Dreyer, Aurora Loan Services 30(b)(6) Dep. at 74-76. docket no. 48-5, filed under seal September 4, 2012. .

[31] Dreyer, Aurora Loan Services 30(b)(6), Dep. at 120-121, 123, docket no. 48-5.

[32] Dreyer, Lehman Bank 30(b)(6), Dep. at 107-108, docket no. 48-2.

[33] Trumpp Dep. at 91, docket no. 48-1.

**Payments Under Indemnity Agreement**

22.     Among other things, the Indemnification Agreement provided that SecurityNational would make initial payments into a "deposit" account and maintain a certain balance with monthly payments up to but not exceeding $125,000, as a security deposit to cover payments from the deposit account for any established Losses under the Indemnification Agreement on loans sold to Lehman Bank.[34]

23.     Pursuant to billing and application statements sent to SecurityNational purportedly pursuant to the Indemnification Agreement, SecurityNational paid $4,281,319.27 into the "deposit" account. All of said funds were applied by Lehman Bank/Aurora against loans, except, perhaps for approximately $76,792.48 which has not been returned to SecurityNational. However, whenever any of the foregoing funds from SecurityNational were applied by Lehman Bank/Aurora, the bank had already been fully compensated.[35]

24.     In light of the foregoing, SecurityNational asserts that $4,281,319.27 was improperly obtained, and was not required to be paid by SecurityNational under the Indemnification Agreement.[36]

**Assignment of Rights in the Indemnification Agreement to LBHI**

25.     In November 2010, SecurityNational sent a letter expressing concerns about overpayment related to the Indemnification Agreement and questioning whether any further payments were due.[37]

---

[34] Indemnity Agreement, docket no. 47-4.

[35] Defendants' Responses to SecurityNational Mortgage Company's Second Set of Interrogatories, docket no. 47-9, filed under seal September 4, 2012; SecurityNational Mortgage Company's Responses to Defendants' First Set of Interrogatories, docket no. 47-10, filed under seal September 4, 2012.

[36] SecurityNational Mortgage Company's Motion for Summary Judgment at 2, docket no. 45. SecurityNational and Defendants agree on the amount SecurityNational paid into the deposit account with the exception of SecurityNational showing $.22 less. See parties' correspondence with the court, lodged as docket no. 93, filed April 30, 2014.

26.        Thereafter, an "Assignment Agreement" ("Assignment") dated March 28, 2011 was allegedly entered into between "Aurora Bank FSB" (Lehman Bank) and Aurora Loan Services as assignors, and LBHI as assignee for an assignment of rights and remedies under the December 17, 2007 Indemnification Agreement.[38]  Among other things the Assignment provides:

> (a) To the extent assignable under the terms of the Agreement, the Assignor hereby assigns, transfers and conveys to the Assignee all rights it may have under the Agreement with respect to the LBHI Mortgage Loans, along with any or all of the remedies Assignor may have against the Seller under the Agreement with respect to the LBHI Mortgage Loans, including, without limitation, all repurchase and/or indemnification remedies and/or claims for damages.[39]

27.        As to why the aforesaid Assignment was made over three years after the date of the Indemnification Agreement, Zachary Trumpp of LBHI (or LAMCO for LBHI) testified:

> Q. (BY MR. PRICE)  Do you have any knowledge or information, Mr. Trumpp, as to why this particular assignment was negotiated?
> MR. SPOHN:  You can answer, again, excepting any communication with counsel.
> A.       Similarly to the assignment of the purchase agreement, it was assigned post – it was assigned to, you know, give Lehman Brothers Holdings, Inc., the opportunity and ability to have the same rights and benefits as Lehman Brothers Bank for the loans that ultimately went from SecurityNational to Lehman Brothers Bank to Lehman Brothers Holdings, Inc.[40]

28.        Mark Anderson, counsel for Lehman Bank, testified:

> Q. (BY MR. PRICE)  Well, Mr. Drosdick or Mr. Spohn, they ever express to you why they even wanted it [Assignment] done?

---

[37] Letter, dated November 18, 2010 from Jeffrey Stephens of SecurityNational to Zachary Trumpp of LAMCO LLC, docket no. 47-11, filed September 4, 2012.

[38] Assignment Agreement, docket no. 47-12, filed under seal, September 4, 2012; *Lehman Brothers Holdings Inc. v. Security National Mortgage Co.*, Case no. 2:11-cv-519 TS, Amended. Complaint ¶ 45, docket no. 23.

[39] Assignment Agreement at 3 when viewed electronically, docket no. 47-12.

[40] Trumpp Dep. at 46, docket no. 48-1.

A. Because they wanted to have rights with respect to – rights under
the SecurityNational indemnification agreement assigned to them as
they pertained to loans that Aurora had assigned to LBHI.
Q. Did they have any explanation as to why this was being done in
March of 2011?
A. No.[41]

\* \* \*

Q. And what can you tell me about what was said in any of those
conversations?
A. I don't recall the specifics of any of those conversations other
than, you know, there were discussions regarding the fact that LBHI
wanted to pursue SecurityNational with respect to those loans that
had been sold by Aurora to LBHI, you know, for the
indemnification agreement.[42]

\* \* \*

Q. If I understood your prior testimony that it was expressed by
them they wanted the assignment, one of the things is they wanted
to go after Security National Mortgage.
A. That –
Q. LBHI.
A. Yes.
Q. And they wanted –
A. My –
Q. – assignment –
A. – understanding.
Q. – so they could do it; isn't that true?
A. Correct.[43]

**The Dispute Arises**

29.     In April 2011, LBHI itself sent out purportedly under the Indemnification

Agreement for the first time a monthly billing to SecurityNational for $125,000 which LBHI

claimed was due by May 10, 2011.[44]

---

[41] Anderson Dep. at 56-57, docket no. 48-4, filed under seal September 4, 2012.

[42] Anderson Dep. at 59-60, docket no. 48-4.

[43] Anderson Dep. at 68, docket no. 48-4.

[44] Docket no. 47-8, filed under seal September 4, 2012.

30.     SecurityNational informed LBHI that the payment would not be made, nor future payments made as no payments were due. Approximately one month later, LBHI unilaterally declared that the Indemnification Agreement was "null and void," as to any Losses not previously paid through SecurityNational's indemnification payments which SecurityNational disputes since it claims that it is owed millions of dollars.[45]

31.     The Indemnification Agreement provides that "LBB and/or Aurora's exercise of any right or remedy under this Agreement shall not limit its exercise of any other right or remedy provided to LBB and/or Aurora by the Seller's Guide, the Purchase Agreement, applicable law, by any other agreement to which it and the Seller are parties or otherwise."[46]

32.     LBHI filed an action on June 8, 2011 against SecurityNational based on the LPA since it claims that the Indemnification Agreement was not in effect, purportedly being "null and void." [47]

33.     Loan 3526 was not sold to LBHI. Rather, the loan was retained by LBB.[48]

## CONCLUSIONS OF LAW

Based on the Statement of Undisputed Facts, the Court hereby makes the following Conclusions of Law.

1.     SecurityNational alleges Breach of Contract and Unjust Enrichment against Lehman Bank and Aurora Loan Services.[49]

---

[45] Letter dated May 10, 2011 from Price to Spohn at 8-9 when viewed electronically, docket no. 47-12, filed under seal September 4, 2012; *Lehman Brothers Holdings Inc., v. Security National Mortgage Co.*, Case No. 2:11-cv-00519 TS, Amended Complaint ¶ 46.

[46] Indemnity Agreement, Section 6, docket no. 47-4.

[47] *Lehman Brothers Holdings Inc. v. Security National Mortgage Company*, Case No. 2:11-cv-00519 TS.

[48] Declaration of Jerald Dreyer, docket no. 55, filed under seal October 11, 2012; Table at 4 when viewed electronically, docket no. 47-5, filed under seal September 4, 2012  Transcript of Hearing,February 27, 2013 at 4-11, docket no. 89, filed April 3, 2013.

[49] Complaint.

2.      Lehman Bank and SecurityNational entered into the LPA dated April 15, 2005 wherein Lehman Bank would purchase residential mortgage loans from SecurityNational. The LPA incorporated by reference a document known as the Seller's Guide which was issued by Aurora Loan Services.[50] Aurora Loan Services did not sign the LPA. LBHI was not a party to the LPA.

**Indemnification Agreement**

3.      Due to alleged issues raised by Lehman Bank/Aurora Loan Services relative to certain loans sold to Lehman Bank by SecurityNational, Lehman Bank, Aurora Loan Services, and SecurityNational entered into the Indemnification Agreement dated December 17, 2007.[51] LBHI is not mentioned in and did not sign the Indemnification Agreement.

4.      Among other things, the Indemnification Agreement provided for certain payments by Security National as a security deposit for any established Losses under the Indemnification Agreement on loans that were sold to Lehman Bank. SecurityNational's Complaint seeks recovery of funds asserted to have been utilized contrary to the Indemnification Agreement.

5.      References to parties in the Indemnification Agreement are quite careless. For example, while Aurora Loan Services was the servicer, both "Aurora" and "Servicer" are mentioned in several places.[52] In addition, in the first text of the Indemnification Agreement which precedes the recitals and operative provisions, LBB is defined two different ways:

> Lehman Brothers Bank, FSB a federal savings bank (together with its successors, assigns, operating divisions, affiliates and subsidiaries, "LBB")

---

[50] Undisputed Facts, 5.

[51] Undisputed Facts, 7.

[52] Indemnification Agreement, Sections 1, 4, docket no. 47-4.

> Aurora Loan Services LLC, a Delaware limited liability company, and wholly-owned subsidiary of LBB (together with its successors, assigns, operating divisions, affiliates and subsidiaries, "Aurora", or collectively with LBB as "LBB")[53]

In spite of the supposed aggregated definition of LBB as including Lehman Brothers Bank and Aurora Loan Services LLC, the Indemnification Agreement refers to them separately on many occasions and never refers to Aurora without referring to LBB. Worse yet, the document uses the connector "and/or" in most instances when referring to LBB and Aurora.[54] Bryan Garner describes "and/or" as rightly "vilified," giving multiple examples of stronger judicial condemnation.[55] Therefore, the Indemnification Agreement appears to ignore this prefatory attempt at defining acronyms, and the agreement's references to parties must be carefully examined.

### Indemnification for Losses – Scope

6.      Among other things, the Indemnification Agreement provides for potential "indemnification" payments by Security National if there were "Losses" relative to loans sold by SecurityNational to Lehman Bank. The term "Losses" used herein is defined in Section 1 of the Indemnification Agreement:

> The Seller hereby and at all times hereafter agrees to indemnify and hold LBB and/or Aurora and the Servicer harmless from and against seventy-five percent (75%) of all losses, damages, penalties, fines, forfeitures, legal or other fees, judgments, costs, expenses, debts, obligations and claims which LBB and/or Aurora or the Servicer may have or may hereafter suffer, incur, be put to, pay or lay out, or sustain as a result of any cause related to any current or future default by the mortgagor on the Mortgage Loans with alleged breaches as detailed on the attached Schedule A on an individual basis (collectively, "Losses").

---

[53]Indemnification Agreement at 2 when viewed electronically, docket no. 47-4.

[54] Sections 1, 2, 4, 5 (including subsections 1, 2, 3, 4 and 5), 6, 7, 8, 10 and 12(e). In only one instance is there a reference to "LBB and Aurora" (section 9) and in one other instance (Section 12(l)), "LBB or Aurora" is employed.

[55] Bryan A. Garner, A Dictionary of Modern Legal Usage 56-57 (2d ed. 1995).

The Indemnification Agreement clearly and unmistakably provides indemnification for certain Losses of Lehman Bank, Aurora Loan Services and the "Servicer."

7.     Lehman Bank and Aurora Loan Services assert that LBHI, which is not a party to the Indemnification Agreement, and not a party to this action, is also indemnified for Losses on Loans pursuant to Section 1 of the Indemnification Agreement based on the prefatory language of the Indemnification Agreement which uses the word "affiliates."

8.     New York law governs the Indemnification Agreement.[56]

**New York Law – Contract Interpretation – Indemnification**

9.     Determining parties' contractual intent requires a court to "give full meaning and effect to all of [the contract's] provisions." [57] A contract should be read "as a whole to ensure that excessive emphasis is not placed upon particular words or phrases."[58] "New York law . . . disfavors interpretations that render contract provisions meaningless or superfluous."[59]

10.      "[I]n New York indemnification agreements are strictly construed; a court cannot find a duty to indemnify absent manifestation of a 'clear and unmistakable intent' to indemnify."[60] "When a party is under no legal duty to indemnify, a contract assuming that obligation must be strictly construed to avoid reading into it a duty which the parties did not intend to be assumed."[61] "The promise should not be found unless it can be clearly implied from the language and purpose of the entire agreement and the surrounding facts and circumstances."[62]

---

[56] Indemnification Agreement, Section 12(d), docket no. 47-4.

[57] *Katel Ltd. Liab. Co. v. AT&T Corp.*, 607 F.3d 60, 64 (2d Cir. 2010).

[58] *South Rd. Assocs., LLC v. IBM,* 826 N.E.2d 806, 809 (N.Y. 2005).

[59] *Manley v. AmBase Corp.*, 337 F.3d 237, 250 (2d Cir. 2003).

[60] *Commander Oil Corp. v. Advance Food Serv. Equip.,* 991 F.2d 49, 51 (2d Cir. 1993), (quoting, *Heimbach v. Metro. Transp. Auth.*, 553 N.E.2d 242, 246 (N.Y. 1990)).

[61] *Hooper Assocs. v. AGS Computers, Inc.*, 548 N.E.2d 903, 905 (N.Y. 1989).

[62] *Id.*

In addition, the structure of the agreement, and the language in the provision and elsewhere in the agreement must be considered.[63]

11.      When an unnamed party asserts coverage by an indemnification provision, the New York courts are particularly strict. *Tonking v. Port Authority of New York and New Jersey* rejected the contention that a "construction manager" referred to by that title 130 times in an agreement could be considered an "agent" of the owner under the specific indemnification clause, even though the agreement clearly designated the construction manager as a "representative" of the owner.[64] Even though the construction manager had the role of "agent" in the project the indemnification clause's use of the term agent could not embrace the construction manager.

> In the case before us . . . the language of the parties is not clear enough to enforce an obligation to indemnify, and we are unwilling to rewrite the contract and supply a specific obligation the parties themselves did not spell out. If the parties intended to cover [the entity claiming coverage] as a potential indemnitee, they had only to say so unambiguously.[65]

12.      Similarly, in another case a contractor's duty to indemnify the project owner for losses to "the persons or property of others" was held not to require the contractor to indemnify the owner for claims made against the owner by employees of the contractor.[66] "Clearly, if it were intended for [the contractor] to assume complete liability, even for its employees' claims, the [owner] could have easily provided that the clause cover" such claims.[67]

---

[63] *See Haynes v. Kleinewefers & Lembo Corp.*, 921 F.2d 453, 457 (2d Cir. 1990).

[64] *Tonking v. Port Auth. of N.Y. & N.J.,* 821 N.E.2d 133 (N.Y. 2004).

[65] *Id.* at 135.

[66] *Solomon v. City of New York*, 489 N.Y.S.2d 592 (N.Y. App. Div. 1985) *aff'd,* 512 N.E.2d 546 (N.Y. 1987).

[67] *Id.* at 597.

**Arguments That LBHI Is an Indemnitee Fail**

13.     Lehman Bank and Aurora Loan Services assert indemnification of LBHI is proper under the introductory text of the Indemnification Agreement. The text precedes the recitals.

> This Indemnification Agreement ("Agreement") dated as of December 17, 2007, is made by and between Lehman  Brothers Bank, FSB a federal savings bank (together with its successors, assigns, operating divisions, affiliates and subsidiaries, "LBB"), and Aurora Loan Services LLC, a Delaware limited liability company, and wholly-owned subsidiary of LBB (together with its successors, assigns, operating divisions, affiliates and subsidiaries, "Aurora", or collectively with LBB as "LBB") having an office for the conduct of business at 10350 Park Meadows Drive, Littleton, Colorado 80134, and Security National Mortgage Company (together with its successors, assigns, operating divisions, affiliates and subsidiaries, "Seller"), having an office for the conduct of business at 5300 South 360 West, Suite 150, Murray, Utah 84123. LBB, Aurora, and the Seller are sometimes referred to herein as parties.

14.     Lehman Bank and Aurora Loan Services argue that LBHI is an affiliate. The term is used only once in the Indemnification Agreement, in Section 11. Section 11 provides for non-disclosure among the "parties," but provides the following specific exception: "[T]his provision shall not limit the right to share information among affiliate or subsidiary entities …." Where the agreement intended to include affiliates in its operative terms, it so stated.

15.     There is no definition of "affiliates" in the Indemnification Agreement. Section 12(o) of the Indemnification Agreement states that "[c]apitalized terms used in this Agreement without definition that are defined in the Seller's Guide are used herein as defined in the Seller's Guide." The Indemnification Agreement does not capitalize "affiliates."

16.     When the Indemnification Agreement references an entity other than Lehman Bank and Aurora Loan Services, the term was capitalized and defined. No such attempt was made with respect to "affiliates" or LBHI.

16A.   The Indemnification Recitals refer to LBB in a way that makes inclusion of LBHI impossible. The recitals state that "LBB and the Seller are parties to a certain Loan Purchase

Agreement . . . ," and then refer to LBB as relying on representations in the LPA when entering into it and purchasing mortgage loans from SecurityNational.

17.     In Section 6, the Indemnification Agreement also refers to the prior LPA, stating that "LBB and/or Aurora's exercise of any right or remedy under this Agreement shall not limit its exercise of any other right or remedy provided to LBB and/or Aurora by the Seller's Guide, the Purchase Agreement [LPA], applicable law, by any other agreement to which it and the Seller [SecurityNational] are parties or otherwise."   The party to the LPA with SecurityNational was Lehman Bank. Aurora Loan Services promulgated the Seller's Guide. This paragraph would be nonsense if LBB as used in the Indemnification Agreement included LBHI, a stranger to the LPA.

18.     Section 7 of the Indemnification Agreement further states that "[n]othing in this Agreement shall be construed to waive LBB's and/or Aurora's requirement for the Seller to strictly perform its obligations under the Purchase Agreement [LPA] and Sellers' Guide …." LBHI was not a party to the "Purchase Agreement" [LPA], or to the Seller's Guide.

19.     Section 8 of the Indemnification Agreement tolls the statute of limitations for claims "that LBB and/or Aurora may have" against the Seller. At the time the Indemnification Agreement was signed, Security National was unaware that any of the Loans had been sold to LBHI and would therefore have been unaware of any tolling of the statute of limitations relative to LBHI. The parties to the LPA were only SecurityNational and Lehman Bank so no one else could have been embraced in the definition of LBB as used in this paragraph. In Section 12(a), the Indemnification Agreement states that "[t]his Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns." This specific reference to successors and assigns shows the parties know how to embrace others

within the benefit of the agreement – and this was not done in the indemnification clause. The reference in Section 12(a) is insufficient under New York Law to add parties to the coverage of the indemnification clause.

20.    Lehman Bank and Aurora Loan Services stated at the Hearing that there was no testimony as why LBHI was not included as a party, nor even any testimony as to whether such inclusion was discussed,[68] even though as of the date of the Indemnification Agreement LBHI had purchased most of the loans for which indemnity is sought.

[Paragraphs 21-24 Intentionally Omitted.]

**LBHI's Purchase of Loans Without Recourse Against Lehman Bank**

25.    When each of the Loans was sold to LBHI, Lehman Bank was fully compensated. At the time of each sale, Lehman Bank was paid the full amount it had expended on each of the Loans. Most of the sales occurred before the Indemnity Agreement was signed.

26.    Further, LBHI"s purchasing of the Loans from Lehman Bank without recourse was part of a business plan or system. The plan or system was to protect the capital of Lehman Bank so as to enhance its capacity to purchase loans for the sale to, and benefit of, LBHI.[69]

**No Losses by Lehman Bank, Aurora Loan Services or the Servicer**

27.    Because LBB sold the Loans to LBHI without recourse, LBHI had no rights or remedies against Lehman Bank, and therefore after the loan sales, Lehman Bank had no remedy under the Indemnification Agreement against SecurityNational.

28.    LBHI represented in the LBHI bankruptcy court that LBHI had no remedies against Lehman Bank for any deficiencies in the Loans.[70]

---

[68] Transcript of Hearing February 27, 2013, at 19:16-19, docket no. 89, filed April 3, 2013.

[69] Undisputed Facts, 15.

[70] Undisputed Facts,  13.

29.     Lehman Bank had no Losses pursuant to the Indemnification Agreement.

30.     Aurora Loan Services never owned any of the Loans, and there is nothing in the record establishing any Losses to Aurora Loan Services. For example, the 30(b)(6) witness for Aurora Loan Services testified that "at the end of the day" Aurora Loan Services, if they ever had any losses, was fully compensated.[71]   Thus, Aurora Loan Services had no Losses pursuant to the Indemnification Agreement.

31.     With respect to the "Servicer," there is no evidence that the Servicer suffered any "Losses" as that term is defined under the Indemnification Agreement. No Servicer other than Aurora has ever been identified.

**Assignment of the Indemnification Agreement Gives LBHI No Right to Indemnity**

32.     The Assignment executed on March 28, 2011 between Aurora Bank FSB (formerly Lehman Bank) and Aurora Loan Services as assignors, and LBHI as assignee is not an assignment of the Indemnification Agreement but states that it was an assignment of "rights" and "including, without limitation, all repurchases and/or indemnification remedies and/or claims for damages" under the Indemnification Agreement.[72]

33.     "It is elementary ancient law that an assignee never stands in any better position than his assignor. He is subject to all the equities and burdens which attach to the property assigned because he receives no more and can do no more than his assignor."[73] "The assignment of rights does not alter the nature of the rights assigned; the assignee merely stands in the shoes of the assignor." [74]

---

[71] Undisputed Facts, 19-20.

[72] Assignment Agreement, Section 2(a), docket no. 47-12, filed under seal September 4, 2012.

[73] *International Ribbon Mill*s, 325 N.E.2d at 139.

[74] *Badiak v. White Plain Kensington, LLC,* 918 N.Y.S.2d 329, 331 (N.Y. Sup. Ct. 2011).

34.     The Assignment Agreement is limited to assigning the indemnity rights of Lehman Bank and Aurora Loan Services only. As a "stranger" to the Indemnification Agreement, LBHI had no enforceable rights or remedies as against SecurityNational, except as Lehman Brothers Bank and/or Aurora Loan Services had any rights or remedies they could enforce against SecurityNational.

35.     Section 1 of the Indemnification Agreement limits its scope to "Losses" to Lehman Bank and/or Aurora Loan Services and the Servicer. At the time of the March 28, 2011 Assignment, Lehman Bank, Aurora Loan Services and the Servicer had no Losses as to any of the Loans. As such, Lehman Brothers Bank and Aurora Loan Services at the time had no rights, damages or claims that they could assert against SecurityNational under the Indemnification Agreement, and thus none may be asserted by LBHI by assignment.

**Breach of Contract**

36.     Lehman Bank and Aurora Loan Services had no right to utilize funds of Security National in the deposit account for the benefit of LBHI, as LBHI was not entitled under the Indemnification Agreement to any indemnity for LBHI's losses. Lehman Bank and Aurora Loan Services were not authorized to utilize funds from the deposit account for the benefit of LBHI.

37.     At the Hearing, Lehman Bank and Aurora Loan Services argued that they were "administrative agents" for LBHI for collecting funds.[75]  There are no facts which establish such an agency.

38.     Lehman Bank and Aurora Loan Services materially breached the Indemnification Agreement and are liable to SecurityNational for the funds utilized for payments to LBHI. The

---

[75] Transcript of Hearing, 24: 3-5, docket no. 89.

parties' positions on the amount due were lodged and filed.[76] At the hearing June 2, 2014, the

amount applied to losses on loans owned by LBHI was established as $3,892,973.70.[77]

39.     Following the summary judgment argument, the parties submitted memoranda on

three additional issues: (1) whether SecurityNational is entitled to prejudgment interest, (2)

whether the fund under the Indemnification Agreement should be replenished, and (3) whether

the $76,000 in undisbursed funds should remain in the fund under the Indemnification

Agreement. [78]

40.     At the hearing held June 2, 2014, Plaintiff waived claims on the $76,000.[79]

41.     SecurityNational is entitled to prejudgment interest. *J. D'Addario & Co., Inc. v.

Embassy Industries, Inc.*[80] and cases following it require specific language for parties to "chart

their own course" and exclude themselves from the operation of laws imposing prejudgment

interest.

> The use of the terms "sole remedy," "sole obligation," and "no further rights" by
> the parties, together with the provision for interest on the escrowed sum, was
> sufficiently clear to establish for purposes of this transaction that interest paid at
> the statutory rate was not contemplated by the parties at the time the contract was
> formed.[81]

The Indemnification Agreement contains no such language. The terms of the

Indemnification Agreement contain no implication of a waiver of prejudgment interest.

---

[76] Docket number 93, filed April 30, 2014; Defendants' Calculation of Amounts Due Per Summary Judgment Order, docket no. 102, filed May 27, 2014.

[77] *See* Defendants' Calculation of Amounts Due Per Summary Judgment Order at 4.

[78] Docket text order, docket no. 103, filed May 27, 2014; Memorandum of SecurityNational Mortgage Company Relative to Issues for June 2, 2014 Hearing, docket no. 104, filed May 30, 2014; Defendants' Memorandum Pursuant to the Court's Order of May 27, 2014, docket no. 106, filed May 30, 2014.

[79] Minute Entry, docket no. 107, filed June 2, 2014.

[80] 980 N.E.2d 940, 943 (N.Y. 2012).

[81] *Id.*

42.     SecurityNational's motion claims "interest at 9% from at least the date of application of SecurityNational funds to the respective loans that were made . . . ."[82] This is the correct date for accrual of interest.

43.     The dates of disbursement of funds are shown in Paragraph 10 of the Findings of Fact. SecurityNational calculated accrual of interest with respect to each loan from the first day of the month immediately following the month of improper payment. The amount of interest so calculated was $1,674,239.97 through May 31, 2014, with a per diem of $959.91 for each day after May 31st until judgment.

44.     Further replenishment of the fund under the Indemnification Agreement appears to be barred by language in the Assignment effecting a waiver, but this was not briefed before the June 2, 2014 hearing. Offset, pleaded as an affirmative defense in the Answer, has not been adjudicated.

---

[82] SecurityNational Mortgage Company's Motion for Summary Judgment at 2, docket no. 45, filed under seal September 4, 2012

**ORDER**

**IT IS HEREBY ORDERED** that SecurityNational Mortgage Company's Motion for Summary Judgment[83] is **GRANTED** and Defendants' Motion for Summary Judgment[84] is **DENIED**.

**IT IS FURTHER ORDERED** that the parties shall meet, confer, and on or before January 16, 2014, file a motion to schedule disposition of issues remaining in the case. The motion shall clarify whether any issues other than offset remain to be resolved.

Dated December 24, 2014.

BY THE COURT:

David Nuffer
United States District Judge

---

[83] Docket no. 45, filed under seal September 4, 2012.

[84] Docket no. 53, filed October 11, 2012.